IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Paramount Shaw, | ) | Case No.: 6:19-cv-3537-JD |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **OPINION AND ORDER** |
| United Mutual of Omaha Life Insurance | ) | |
| Company of North America, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This is an action seeking long-term disability benefits, which is governed by the Employee Retirement Income Security Act ("ERISA"). This matter is before the Court on the parties' cross motions for Judgment on the Pleadings (DE 13, 14), pursuant to the ERISA Case Management Order (DE 7). For the reasons set forth below, Defendant United Mutual of Omaha Life Insurance Company of North America's ("United" or "Defendant") Motion for Judgment on the Pleadings is **GRANTED**, and Plaintiff Paramount Shaw's ("Shaw" or "Plaintiff") Motion for Judgment on the Pleadings is **DENIED**.

## I.     FINDINGS OF FACT

Based on a review of the cross memoranda and administrative record, the Court finds the following. Shaw was hired to work for Generations Group Homes, Inc. ("Generations") as a Residential Counselor on December 4, 2017. (DE 12-14, SHAW-002474.) Generations is a group home, and Shaw's job description included the following: "responsible for the supervision and management of emotionally disturbed children and/or adolescents within a therapeutic residential milieu serving as a positive role model and providing direct supervision of residents to prevent acts of physical or sexual aggression, elopement, property destruction or other behavior that may

1

place the residents, staff, or community at risk." (DE 14, pp. 2-3.) The job description also indicates that the job requires carrying up to 75 pounds, occasionally, for one to two hours and 76 pounds or more from zero to one hour per day. (DE 12-14, SHAW 002517.) As part of his employment Shaw was insured under a group policy ("Policy") issued by Defendant United and held by Generations. Specifically, the Policy provided:

> "[T]he discretion and the final authority to construe and interpret the Policy. This means that [United has] the authority to decide all questions of eligibility and all questions regarding the amount and payment of any Policy benefits within the terms of the Policy as interpreted by [United]. Benefits under the Policy will be paid only if [United] decide[s], in [its] discretion, that a person is entitled to them. In making any decision, [United] may rely on the accuracy and completeness of any information furnished by the Policyholder or an Insured Person. [United's] interpretation of the Policy as to the amount of benefits and eligibility shall be binding and conclusive on all persons."

(DE 12-2, Shaw 000309.) The Policy further provided for an exclusion for Pre-Existing conditions:

> PRE-EXISTING CONDITION EXCLUSION
>
> A *Pre-existing Condition* means any Injury or Sickness for which You received medical treatment, advice or consultation, care or services, including diagnostic measures, or had drugs or medicines prescribed or taken in the 12 months prior to the day You become insured under the Policy. We will not provide benefits for any Disability caused by, attributable to, or resulting from a Pre-existing Condition which begins in the first 12 months after You are continuously insured under the Policy.

(DE 12-2, Shaw 000305-06.)

Shaw was involved in a motor vehicle accident on March 1, 2018, the date of his effective coverage under the Policy. (DE 12-14, SHAW 002475.) On April 26, 2018, as part of processing Shaw's short-term disability claim, Defendant issued an assessment ("April Assessment") of Mr. Shaw's then current condition and its analysis of a one year look back contained in the Long Term Disability ("LTD") insurance policy, a period which is March 1, 2017 to February 28, 2018, to determine if there were any pre-existing conditions during that time period that could potentially

disqualify Shaw from LTD benefits. (DE 12-1, SHAW-000199-000203.) The April Assessment cites the documents reviewed, including the attending physician statement of Dr. Carole Mercer, an internist who cared for Mr. Shaw and his medical records from Dr. Mercer and other providers for the period of March 10, 2017, to February 12, 2018. These include a lumbar spine x-ray from November 10, 2017, and chest x-ray from December 18, 2017.

The April Assessment also noted Mr. Shaw's visit to Dr. Mercer on March 22, 2018, for injury incurred as a result of the March 1, 2018, accident indicating he suffered neck pain, bulging (cervical) discs, and (cervical) spinal cord compression and pain and numbness in hands and neck. Dr. Mercer also noted that Mr. Shaw will be consulting with a neurosurgeon. (DE 12-2, SHAW 000201). A medical summary is then given regarding Mr. Shaw's visits to his health care providers during the look back period, including prostate surgery, coronary artery disease, dilated cardiomyopathy, right inguinal hernia, hydroceles, umbilical hernia, constipation, hypertension, elevated liver enzymes, lumbar facet disease, left lower back pain down leg-aching and fire, which he has had since his twenties, and BPH (benign prostatic hyperplasia). The summary of the medical analysis states that Mr. Shaw "did not complain or [seek] treatment or medications for neck pain/bulging disc or spinal cord compression during the look back time. . . ." The same observations are cited in the conclusion section. (DE 12-2, SHAW 000202.) The analysis ends with a section entitled "CONSIDERATION/NEXT STEP: None."

On May 1, 2018, Mr. Shaw was examined by Dr. Philip Hodge ("Dr. Hodge"), a neurosurgeon. There are extensive notes of that examination. (DE 12-1, SHAW 0177-00197.) Dr. Hodge noted a diagnosis of "Cervical spondylosis with myelopathy" (SHAW 00177). Dr. Hodge noted that:

> Cervical spondylosis with myelopathy-Primary Mr. Shaw presents after a motor vehicle accident approximately 1 month ago. Since that time, he has been having bilateral arm numbness tingling and pain. He also reports problems with balance at

3

> night and minimal manual dexterity problems. He has increased reflexes on the right lower extremity suggestive of myelopathy. His MRI of the cervical spine shows severe stenosis from C3 to see (sic) 7 and high signal change in the cord at C6-7. I feel that he needs a posterior cervical laminoplasty from C#-C7 to prevent further neurologic deficit. He has a pre-existing condition that was aggravated by his motor vehicle accident.

(DE 12-1, SHAW 00186.) Dr. Hodge's notes also gave a thorough listing of Mr. Shaw's past medical history as of May 1, 2018. It included diagnoses such as diabetes, hepatitis, kidney stones, stroke, and other conditions, but there was no reference to any past medical history diagnosis regarding the cervical spine. (DE 12-1, SHAW-000178.) The notes also listed Mr. Shaw's previous surgical procedures as of May 1, 2018, and contained several surgical procedures such as prostate biopsy and hernia repair, but there were no surgeries listed regarding the cervical spine. (DE 12-1, SHAW-000178-000179). Attached to Dr. Hodge's notes was the report for a cervical spine MRI performed on Mr. Shaw on April 10, 2018. Among other things, the report identified moderate degenerative disc disease ("DDD") at C3-C4, degenerative disc at C4-C5, degenerated disc at C5-C6, severe DDD at C6-C7. The report indicates under "impression" among other things, "central canal stenosis at C3-4 through C6-7." (DE 12-1, SHAW 000189.)

On June 1, 2018, Defendant issued a letter to Mr. Shaw indicating that benefits from the Short Term Disability ("STD") policy were approved for the period of March 7, 2018, through May 4, 2018. Mr. Shaw had surgery on his surgical spine on or around July 21, 2018. (DE 12-8, Shaw 001396.) On July 20, 2018, Mr. Shaw underwent cervical laminoplasty with decompression on C-3-7. Unfortunately, the surgery did not result in him being able to resume working. (DE 12-14, SHAW-002475.) Mr. Shaw was discharged from the hospital on July 26, 2018, and entered RCP (Roger C. Peace) for rehabilitation. (DE 12-3, SHAW 000523.) He was discharged from that facility on August 3, 2018, with direction of continuation of physical therapy and his family providing 24/7 supervision.

4

Mr. Shaw's employment with Generation ended around August 20, 2018. In connection with the payments from the STD policy, Defendant did not claim that Mr. Shaw should not be able to collect payments as a result of a pre-existing condition or that any part of the payment would be offset as a result of receipt of other income. On or around August 10, 2018, records from Southeastern Neurosurgical & Spine Institute, which performed Mr. Shaw's cervical surgery, were faxed to Defendant. (DE 12-1, SHAW 000097-000118) These pages provided in depth information regarding Mr. Shaw's injuries, treatment, history and more.

On or around August 24, 2018, Mr. Shaw was telephone interviewed by Stephanie Smith on behalf of Defendant. It was referred in an email prepared by Ms. Smith as an "Initial In depth Telephone Call doc. (DE 12-18, SHAW 003269). A variety of issues were discussed on that call, and the memorandum prepared by Ms. Smith regarding that call consists of a variety of topics and under each topic are the questions asked and the answers provided by Mr. Shaw. Among the questions asked were whether Mr. Shaw had any neck pain prior to the March 1, 2018, accident. Mr. Shaw's answer was "No." (DE 12-18, SHAW 003270.) Mr. Shaw also indicated in response to questioning that he had done in patient physical therapy for about a week (after the operation) and then he was sent home but that he had an appointment for the next week to continue physical therapy.

On August 27, 2018, Defendant sent a letter to Mr. Shaw indicating that it had begun its review of his "medical documentation and eligibility information for the transition from [his] Short-Term Disability claim to [his] Long-Term Disability Claim." (DE 12-13, SHAW 002354-002356.) The letter contains, among other things, a list of documents that Defendant requested Mr. Shaw to provide, including records from several medical providers. The letter also states, "We will not provide benefits for any Disability caused by, attributable or resulting from a Pre-existing

5

Condition which begins in the first 12 months after You are continuously insured under the Policy." (DE 12-13, SHAW 002355.)

In the year leading up to the accident, Mr. Shaw had numerous medical challenges, but he had no symptoms or issues with his cervical spine. For example, on August 31, 2018, he caused the urology department at Greeneville Health System to send to Defendant seventy-five (75) pages of medical records regarding Mr. Shaw. It included many pages of records of his health prior to his accident. (DE 12-17 – 12-18, SHAW 003145- 003218.) While most of the focus of these records is on urological issues, there are documents that provide Mr. Shaw's medical history. For example, a medical history recorded by the urology department on or around January 23, 2018, reflects a variety of medical issues unrelated to urology such as hepatitis, diabetes, and stroke. (DE 12-17, SHAW 003192.) There is no mention of any cervical issues.

Mr. Shaw was still going to physical therapy as of October 30, 2018. That record also shows that although Mr. Shaw was cleared by Dr. Hodge to return to work, Mr. Shaw had concerns over being able to perform previous work requirements.[1] On October 31, 2018, Plaintiff continued to provide additional information to Defendant in support of his claim. On that day, as reflected in a cover letter from counsel (DE 12-14, SHAW 002514), he electronically mailed his Job Description from Generations (DE 12-14, SHAW 002515-002518) and a completed Health Questionnaire (DE 12, SHAW 002519-002525), which provides the names, addresses and telephone numbers of eleven medical providers he had consulted with on any condition from January 1, 2017, to the then present date, as well as listing the names and dosages of approximately 20 medications, supplements, and vitamins that he has taken since January 1, 2017. The

---

[1] For these facts, Plaintiff cites to DE 12-1, SHAW-00181; however, the records do not appear to correspond to these facts. The Court notes that the record is voluminous, and the Defendant did not object to these facts. Accordingly, the Court treats these facts as undisputed.

transmission also included a letter from the Social Security Administration notifying Mr. Shaw that his Social Security benefits were increased as of January 1, 2018, because the previous amounts that he had been sent were incorrect. (DE 12-14, SHAW 002526-002527.)  The e-mail transmission also included a copy of the accident report from the March 1, 2018, motor vehicle accident that resulted in the injury. (DE 12-14, SHAW 002528.)  The transmission also included a form entitled "Third Party Authorization for Release of Information" authorizing certain disclosure of medical information. (DE 12-14, SHAW 002529.)

On November 16, 2018, Defendant sent a denial of benefits letter to Mr. Shaw's counsel regarding the claim for LTD payments. (DE 12-13, SHAW 002364-002371. It discusses, but does not deny, benefits based on the "pre-existing condition exclusion." The denial letter asserts that determinations that the claimant is entitled to benefits may require certain supporting information, such as clinical records and other sources. (DE 12-13, SHAW 002366.)   In the denial letter, Defendant indicated that it based its decision on a variety of sources including records of some of Mr. Shaw's medical providers.  The denial letter goes on to mention that Defendant asked for certain other information. (DE 12-13, SHAW-002367.)  The letter indicated that among the information used to make its determination were medical records, the attending physician's statement portion of the application for STD from Dr. Carole Mercer ("Dr. Mercer"), dated March 22, 2018, three different health questionnaire forms, pharmacy records starting prior to the exclusionary period and through September 18, 2018, medical records of Dr. Mercer throughout the exclusionary period, and records from Dr. Philip Hodge, the neurosurgeon who operated on Mr. Shaw for the period from which he treated Mr. Shaw. (DE 12-13, SHAW 002366). Nothing in the letter suggests that Mr. Shaw's health is such that he does not qualify for LTD or that he falls within the exclusion for pre-existing conditions, stating:

7

> In summary, because we have not received the requested Social Security Disability Retirement Award Letter and Medical records for the period of January 1, 2017 to present from Dr. Megan Witt, Kate Nattier, PA, Dr. Cory Mitchell, Hillcrest Hospital, Dr. William Curran, Dr. Steven Yarborough, Dr. Teresa Truman and Greenville Memorial Hospital, we are unable to render a decision on Mr. Shaw's claim at this time. Therefore, no benefits are payable, and the claim has been denied.

(DE 12-13, SHAW 002370.) At that time, the providers from which Defendant were still seeking records were limited to Dr. William Curran (a pulmonologist), Dr. Steven Yarborough (a gastroenterologist), and Teresa Truman (a Nurse Practitioner in gastroenterology). (DE 12-9, SHAW 001493.) Mr. Shaw appealed this denial of his LTD claim.

On May 20, 2019, Mr. Shaw's counsel received an email from Defendant indicating a review was made of Mr. Shaw's claim file. It stated that a previous letter of May 16, 2019, was being amended to request documents for the period of January 1, 2017 to the present from Hillcrest Hospital, Dr. Curran, Dr. Yarborough, Ms. Truman, and Greenville Memorial Hospital. The May 20, 2019, email also stated:

> We are requesting clarification of the medical record from Dr. Philip Hodge, Neurosurgeon. In the office visit dated May 01, 2018, Dr. Hodge states, "He has a pre-existing condition that was aggravated by his motor vehicle accident." Please request an explanation of the pre-existing condition Dr. Hodge is referring. We will accept a letter from Dr. Hodge addressing the specific condition. We do not have an authorization to request this directly from Dr. Hodge and it is your responsibility to provide this information for our review.

(DE 12-9, SHAW 001493.) On July 19, 2019, Defendant upheld the denial of the claim and declined to pay LTD benefits. (DE 12-2, SHAW 000323-000328.) It cited the provisions in the policy regarding the definition of Disability and Disabled. It also repeated the definition of "Pre-existing condition" that appeared in the original denial letter and explained that for Proof of Disability, "A completed claim form and other information needed to prove loss must be submitted to US within 90 days after the end of the Elimination Period." It also provided certain exceptions to the deadline for proof of disability. The denial letter also contained the same language as the

8

previous denial letter regarding the definition of pre-existing claims and the criteria for excluding pre-existing claims. (DE 12-2, SHAW 000323-000324.)  The letter also indicated that additional information such as clinical records, charts, x-rays, poof of earnings and other diagnostic aids might be required to present in order to receive an award. (DE 12-2, SHAW 000324.)  The letter then lists all of the information used as a basis for the denial of benefits.  It included materials it had considered in connection with the original LTD application and other materials including: x-rays reports, chest X-rays reports, lumbar spine X-ray report, cervical spine MRI reports and additional records generated a since the time of Mr. Shaw's release from the hospital and beyond. (DE 12-2, SHAW 000324-325.)  The letter cited requests for other records from medical providers, such as the previous request of Mr. Shaw's pulmonologist and gastroenterologist. (DE 12-2, SHAW 000326.)  In denying the appeal, the letter stated, "we did not receive the above medical documentation needed to determine whether the pre-existing condition exclusion applied to your client's claim. (DE 12-2, SHAW 000327.)  It also states that it "did not receive medical records for the period of January 1, 2017, to March 01, 2018, or verification that there were no records from the providers identified."  The letter concludes by stating, "Due to the lack of information for the time period requested, there was insufficient information to complete our eligibility review regarding the pre-existing condition provision. Therefore, no benefits are payable, and Mr. Shaw's claim denial has been upheld."

## II. PROCEDURAL HISTORY

On November 22, 2019, Plaintiff filed a Complaint in the Greenville County Court of Common Pleas, and Defendants removed the action within 30 days of service. (DE 1.)  In the Complaint, Shaw alleges he is unable to perform the duties of any occupation due to several limiting medical conditions.  Shaw alleges a single cause of action under 29 U.S.C. § 1132(a)(1)(B) to recover LTD benefits.

On October 13, 2020, the Parties filed a Joint Certification regarding the Administrative Record, Plan Documents, standard of review, and other matters. (DE 8.) On January 7, 2021, the Parties filed the Evidentiary Record as an appendix to the Joint Stipulation. (DE 12.) The Administrative Record and Plan Documents are attached thereto as Exhibits 1 through 18. The Parties stipulated the Court may dispose of this case based on cross-memoranda for judgment. The Parties further stipulated that the central inquiry for resolution by the Court is "whether Defendant abused its discretion in denying Plaintiff's claim for benefits." (DE 12, p. 3.) On January 7, 2021, the Parties filed their cross motions for Judgment on the Pleadings. (DE 13, 14.) Under the Amended Specialized Case Management Order, response briefs were due five days after the submission of the cross-memorandum. (DE 7.) The Parties filed response briefs on January 12, 2021. (DE 16, 17.)

### III.     CONCLUSIONS OF LAW

#### A.     Standard of Review

A denial of benefits challenged under § 1132(a)(1)(B) is reviewed under an abuse of discretion standard where, as here, "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). Here, the Parties have stipulated that the standard of review is abuse of discretion. (DE 12, p. 3.) The abuse of discretion standard is "highly deferential" to the plan administrator. Cosey v. Prudential Ins. Co. of Am., 735 F.3d 161, 168 (4th Cir. 2013). In applying this standard, "[t]he court must not disturb the administrator's decision if it is reasonable, even if the court itself would have reached a different conclusion." Haley v. Paul Revere Life Ins., 77 F.3d 84, 89 (4th Cir. 1996) (citation omitted). In assessing reasonableness of the administrator's decision, the Court may consider non-exclusive factors, including:

10

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Champion v. Black & Decker (U.S.) Inc., 550 F.3d 353, 359 (4th Cir. 2008) (quoting Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan, 201 F.3d 335, 342–43).  Here, the Parties have only made arguments relating to the first, third, fifth, and eighth factors. Analysis of those factors is subsumed within the Court's discussion below.

### B. United's Decision to Uphold the Denial of Benefits Was Not an Abuse of Discretion.

#### 1. United's Determination Was Supported by Substantial Evidence and Based on the Consideration of Adequate Materials.

As stipulated, the central inquiry is whether it was an abuse of discretion for United to deny Plaintiff LTD benefits.  The Administrative Record contains substantial evidence supporting United's determination.  The record contains considerable evidence that Plaintiff's neck and back condition may have been pre-existing. There are more than a dozen references to Plaintiff's history of neck and back problems, and Dr. Hodge specifically noted that the motor vehicle accident aggravated Plaintiff's pre-existing condition. Thus, it was justifiable and reasonable for United to require records from providers identified by Plaintiff who treated him during the "look back" period, especially considering the discretion afforded to United under the Policy.

Further, the materials underlying United's decision in this case were adequate. The administrative record contains a number of references suggesting that Plaintiff's condition was pre-existing and that he received treatment during the "look back" period. In light of these references, United requested medical records from the Plaintiff's treating physicians during the

"look back" period to assist in its determination and it requested them from Plaintiff. Specifically, the administrative record shows that United contacted Plaintiff or his counsel to inquire about the status of records on more than a dozen occasions.

The burden of showing disability is on the claimant. It is a claimant's duty to gather the evidence and provide it to the insurer. See Davidson v. Prudential Ins. Co., 953 F.2d 1093, 1096 (8th Cir. 1992); Mason v. M.F. Smith & Assocs., Inc., 158 F.Supp.2d 673, 684-85 (D.S.C. 2001). It is well-settled Fourth Circuit law that a plan administrator is "under no duty to secure specific forms of evidence." Elliott v. Sara Lee Corp., 190 F.3d 601, 609 (4th Cir. 1999). Despite the fact that the burden was on Plaintiff to prove his disability in this case, United extended significant effort to obtain information from Plaintiff to ensure the completeness of the administrative record. The absence of records in the record is due to Plaintiff's repeated failure to provide the same. Thus, the materials relied upon in this case were adequate.

> 2. **The Evidence Relied Upon by Plaintiff Does Not Show that United's Determination Was Unreasonable in Light of the Language of the Plan.**

By Plaintiff's admission, there is significant evidence that Mr. Shaw had degenerative disc disease and stenosis with respect to his cervical spine during the lookout period. Plaintiff further contends that for these conditions to disqualify him from the benefits, they would have to fall into the category of "any injury or Sickness for which [Mr. Shaw] received medical treatment, advice or consultation care or services, including diagnostic measures, or had drugs or medicines prescribed or taken in the 12 months prior to the day [Mr. Shaw] become insured under the Policy." (DE 12-1, SHAW 000199.) However, the policy afforded United wide discretion:

> "[T]he discretion and the final authority to construe and interpret the Policy. This means that [United has] the authority to decide all questions of eligibility and all questions regarding the amount and payment of any Policy benefits within the terms of the Policy as interpreted by [United]. Benefits under the Policy will be paid only if [United] decide[s], in [its] discretion, that a person is entitled to them. In making

12

> any decision, [United] may rely on the accuracy and completeness of any information furnished by the Policyholder or an Insured Person. [United's] interpretation of the Policy as to the amount of benefits and eligibility shall be binding and conclusive on all persons."

(DE 12-2, Shaw 000309.) While the records may provide an accurate account of previous medical history related to Mr. Shaw's back, United is entitled to the documents it requested in accordance with the terms of the Policy in order to determine whether to pay out disability benefits under the Policy.

### 3. United's Determination Was the Result of a Deliberate, Principled Process.

United's decision in this case was both reasoned and principled, and Plaintiff was afforded every opportunity to provide requested materials. Substantial evidence in an administrative record has been defined in ERISA cases as "more than a scintilla, but less than a preponderance." Tucci v. First Unum Life Ins. Co., 446 F.Supp.2d 473, 485 (D.S.C. 2006) (substantial evidence present despite absence of independent physician's records as record lacked evidence of disability); Anderson, 348 F.Supp.2d at 635 (finding that plaintiff's admission that he was working in his wife's business was, when coupled with the plaintiff's reports to his doctors, "substantial evidence" to support the decision to deny benefits); Davidson v. Kemper Nat'l Services, 231 F.Supp.2d 446, 451 (W.D. Va. 2002) (substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion). In light of the above chronology, including its significant outreach efforts, United afforded Plaintiff every opportunity to provide information. Thus, United conducted a full and fair review and its decision to deny benefits was reasonable under the circumstances.

### 4. United's Decision Was Not Influenced by a Conflict of Interest.

Plaintiff argues that United was operating under a conflict of interest. (DE 14, pp. 13-14.) However, Plaintiff's conclusory assertion that United had fiduciary responsibilities to the

13

employees and was also determining who to pay out LTD and how much to pay is not supported by evidence in the record as to the effect of this relationship had on United's decision.  This factor is only significant if the plaintiff points to "evidence of how the conflict of interest affected the interpretation made by the administrator," or evidence of "a history of biased claims administration."  Fortier v. Principal Life Ins. Co., 666 F.3d 231, 236 n.1 (4th Cir. 2012).  Here, Plaintiff has not pointed to any evidence showing that a conflict influenced United's determination or any history of biased decisions.

## IV.     CONCLUSION

For the reasons set forth above, Defendant's Motion for Judgement on the Pleadings, DE 13, is **GRANTED**, and Plaintiff's Motion for Judgement on the Pleadings, DE 14, is **DENIED**. Because the Court affirms the denial of benefits, and in light of the relative resources of the parties, the Court declines to award attorneys' fees to either party.

**IT IS SO ORDERED**.

Joseph Dawson, III
United States District Judge

Greenville, South Carolina
July 23, 2021